DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 INTRODUCTION {¶ 1} This case concerns the permanent custody of S.S., a seven-year-old girl. The child's mother, April S., has challenged the juvenile court order granting permanent custody of her daughter to the Summit County Children Services Board. The mother has argued that the child should have either been returned to her or, alternatively, should have been placed in the legal custody of Norma Drake, the child's maternal grandmother. In regard to the question of placement with Mrs. Drake, the mother has contended that evidence of the grandmother's prior history with the children services agency should not have been admitted *Page 2 
based on hearsay and relevance grounds. Upon consideration, this Court has concluded that the trial court did not err in denying the motion for legal custody to Mrs. Drake, terminating the parental rights of the parents, and placing the child in the permanent custody of the agency.
 BACKGROUND {¶ 2} The mother of S.S. had three children, but only the custody of S.S., born June 21, 2000, is at issue in this appeal. All three children had different fathers. The father of S.S. was identified by the mother only as a man named Chris who lived in Lima, Ohio. Neither he nor any other man claiming to be the father of S.S. was involved in the juvenile court proceedings. Only the mother has appealed from the judgment of the juvenile court.
 {¶ 3} The agency initially became involved with this family in 2001 when S.S. was abused by Corey Smith, the mother's boyfriend and biological father of another of her children. S.S. suffered a skull fracture, liver laceration, subdural bleeding, a broken clavicle, and bruising across her chest. Mr. Smith was subsequently convicted of felonious assault and child endangering. He was sentenced to 90 days of home incarceration and five years of community control. He was also ordered not to "have any care, custody, or control of any minor children at any time for any reason." S.S. was removed from the home, but was eventually returned to the custody of her mother. *Page 3 
 {¶ 4} This case began with another concern of physical abuse of S.S. According to the agency's complaint, filed on October 18, 2005, the child stated that she had been struck with a belt by her mother. The complaint also alleged that the mother had taken S.S. to the home of Mr. Smith the previous day. A medical examination revealed significant bruising on the child's legs, back, chest, and stomach, some of which were possible belt marks. The marks were alleged to be in various stages of healing.
 {¶ 5} As the matter proceeded to adjudication and disposition, the juvenile court found S.S. to be abused, neglected, and dependent and granted temporary custody of the child to the agency. The agency initially placed S.S. with Mr. Smith's parents, and later placed her with Mrs. Drake, her maternal grandmother. By February 2006, it became apparent that S.S. required special care and the child was placed in a therapeutic foster home.
 {¶ 6} By agreement of the parties, a six-month extension was granted in February 2007. The guardian ad litem favored an extension so that Mrs. Drake could become more familiar with the child's needs should the child be placed in her home. The agency was directed by the trial court to reassess the possibility of placing the child in the legal custody of Mrs. Drake.
 {¶ 7} The agency eventually moved for permanent custody. The mother moved for custody, or, alternatively, for a grant of legal custody to Mrs. Drake. Through counsel, the child also moved for legal custody to Mrs. Drake. Following *Page 4 
a two-day hearing, the trial judge granted the agency's motion for permanent custody and denied both motions for legal custody. Specifically, the juvenile court found that the child's father had abandoned her and that the child cannot and should not be placed with either parent within a reasonable time. In addition, the trial court found that the child had been in the temporary custody of the agency for more than 12 months of the consecutive 22-month period prior to filing of the motion for permanent custody. Furthermore, the trial court concluded that the grant of permanent custody to the agency was in the best interest of the child, based on an analysis of the factors of Section 2151.41.4(D) of the Ohio Revised Code. The child's mother has appealed the judgment of the trial court and has assigned three errors for review.
 PERMANENT CUSTODY {¶ 8} The mother has argued that the weight of the evidence fails to support the decision to grant permanent custody of the child to the children services agency, the trial court abused its discretion in denying legal custody to Mrs. Drake, and the trial court erred in permitting testimony regarding Mrs. Drake's prior history with the agency. Because the arguments are legally and factually related, this Court will address them together.
 {¶ 9} Before a juvenile court can terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the *Page 5 
child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under Section 2151.41.4(E) of the Ohio Revised Code; and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under Section 2151.41.4(D) of the Ohio Revised Code. See R.C. 2151.41.4(B)(1) and 2151.41.4(B)(2); see, also, In reWilliam S., 75 Ohio St. 3d 95, 97-99 (1996).
 {¶ 10} The trial court found that the first prong of the permanent custody test was satisfied because S.S. had been in the temporary custody of the children services agency for at least 12 of the prior 22 months, and also because the child could not or should not be placed with either parent within a reasonable time. In addition, the trial court found that the father had abandoned his child. The child's mother has not challenged any of the findings on the first prong of the permanent custody test. She has challenged only the trial court's determination that the second prong was satisfied by a finding that it was in the best interest of the child to be placed in the permanent custody of the agency.
 {¶ 11} In State v. Wilson, 113 Ohio St. 3d 382, 2007-Ohio-2202, at ¶ 24, the Ohio Supreme Court held that an appellate court may not reverse a trial court's judgment in a civil case if that judgment is supported by "some competent, credible evidence going to all the essential elements of the case." When, as in this *Page 6 
case, the trial court's judgment was in favor of the party with the burden of proof, this Court must affirm that judgment if it is supported by evidence that, if believed, would satisfy the burden of proof.Id. at ¶ 26.
 {¶ 12} When determining whether a grant of permanent custody is in the child's best interest, pursuant to the second prong of the permanent custody test, the juvenile court must consider: (1) the child's personal interactions and relationships; (2) the child's wishes regarding placement; (3) the custodial history of the child; (4) whether there are appropriate alternatives to permanent custody, and (5) whether any of the factors in R.C. 2151.41.4(E)(7) to (11) apply. R.C. 2151.41.4(D). Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. See In re Smith, 9th Dist. No. 20711, 2002-Ohio-34; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 13} This Court has previously held that the question of whether a legal custody placement is appropriate essentially invokes consideration of the same factors as a determination of the best interest of the child for purposes of a permanent custody decision. See In re S.N., 9th Dist. No. 23571, 2007-Ohio-2196, at ¶ 27 and R.C. 2151.41.4(D). Consequently, this Court will proceed to review the factors stated in R.C. 2151.41.4(D) in reviewing the decisions of the trial court as to permanent custody and legal custody. *Page 7 
 {¶ 14} That permanent custody is in the best interest of the child must be established by clear and convincing evidence. Clear and convincing evidence is that which will produce in the trier of fact "a firm belief or conviction as to the facts sought to be established."In re Adoption of Holcomb, 18 Ohio St. 3d 361, 368 (1985) (quotingCross v. Ledford, 161 Ohio St. 469, paragraph three of the syllabus (1954)). In addition, the decision to grant or deny a motion for legal custody is within the sound discretion of the juvenile court. In reM.S., 9th Dist. No. 22158, 2005-Ohio-10, at ¶ 11. This Court will not reverse a juvenile court decision as to legal custody absent an abuse of discretion. Id.
 {¶ 15} The first best interest factor calls for consideration of the child's interactions and relationships with others. See R.C. 2151.41.4(D)(1). S.S. had three relevant relationships: her mother, her grandmother, and her foster family. She also had a limited relationship with her two siblings, but the record indicates that she saw one sibling only two or three times a year and saw the other less often.
 {¶ 16} At the outset, it appears that the condition of the child may be helpful to understanding her relationships with these individuals. Amanda Hyter, case manager for the foster care agency that supervised the child's foster care placement, testified that, at the beginning of this case, five-year-old S.S. exhibited frequent severe temper tantrums, a very short attention span, impulsivity, lack of boundaries, and inappropriate sexual behavior. Caseworker Valerie Metzel also *Page 8 
explained that the child would lash out, kick, hit, bite, and punch even when unprovoked. S.S. was diagnosed with attention deficit hyperactivity disorder and adjustment disorder with mixed disturbance of conduct and emotions. She needed counseling and psychiatric therapy to address her emotional issues, hyperactivity, and aggression. The therapeutic foster family with whom she was placed had received specialized training and provided her with a structured home and constant supervision.
 {¶ 17} Both Ms. Hyter and Ms. Metzel believed that the child's behavior had definitely improved over the preceding two years, but that significant concerns remained. Ms. Metzel believed that S.S. continued to need a therapeutic placement, but that she was adoptable. Ms. Hyter reported that S.S. was very friendly, bubbly, and outgoing, but had trouble staying focused and is behind intellectually. She had not been in school prior to her placement and had to repeat kindergarten. Ms. Hyter emphasized that structure and routine is absolutely necessary for the success of this child in order to help her control her temper tantrums and impulsivity.
 {¶ 18} As to the child's relationship with her foster family, Ms. Hyter testified that S.S. was bonded with that family and interacted very positively with them. She was loving and affectionate with them, and she called them foster mom and dad. They reciprocated with love and attention. The foster family had indicated that they were not in a position to adopt S.S. at the time of the hearing. *Page 9 
 {¶ 19} Next, S.S. was said to have a bond with her mother and her mother apparently visited regularly. According to the caseworker, the mother did demonstrate some things that she probably learned in parenting classes, but she also tended to ignore negative behaviors that should have been addressed.
 {¶ 20} Other than visiting with her child, the mother failed to complete any aspect of her case plan. Very early in the process, the mother decided that she would be unable to accomplish the requirements and she stopped trying. She told her caseworker that she believed an award of legal custody to Mrs. Drake or adoption by the foster parents were better options. The child's mother never demonstrated that she had suitable housing. After she went to stay with a friend in September 2006, she never even provided the agency with an address. She failed to complete a parenting skills course, attending only eight of twenty-four classes. She never began the requested counseling program or any part of the drug component of her case plan. She did not complete a substance abuse evaluation, nor did she perform the bi-weekly drug testing that was requested following a positive drug test in June 2006.
 {¶ 21} After August 2006, the mother consistently made it clear to her caseworker that she was not going to work her case plan and wanted Mrs. Drake to have legal custody of S.S. Dr. Arcangela Wood, clinical psychologist, testified similarly, that the mother did not want to complete her psychological evaluation, but would prefer that her daughter be placed with Mrs. Drake or in foster care. *Page 10 
 {¶ 22} Dr. Wood testified that the mother showed up for her first session smelling of alcohol, and the mother later admitted that she had been drinking before the appointment — three beers and two double shots. The mother admitted using alcohol to excess. She claimed that she last used marijuana in 2000, but tested positive for the drug in 2006. Dr. Wood testified that the mother had been in several relationships with males, including two that included domestic violence. Dr. Wood recommended a substance abuse assessment and random urine screens, but the mother did not comply with either of those recommendations.
 {¶ 23} According to Dr. Wood, the mother was diagnosed with alcohol abuse, cannabis abuse, and a borderline personality disorder with histrionic traits. Dr. Wood testified that these characteristics led the child's mother to a series of very chaotic and unstable relationships, which had a negative impact on her and her children, but which the mother minimized. She has poor judgment and poor decision-making, as exemplified by her failure to follow through with parenting classes or a substance abuse assessment.
 {¶ 24} Finally, S.S. also had a bond with Mrs. Drake, her grandmother, who expressed an interest in placement or custody. According to the caseworker, Mrs. Drake seemed to make a point of visiting with S.S. The child was said to be comfortable and appropriate with her. The caseworker noted a great deal of interaction between Mrs. Drake and S.S. during those visits. Mrs. Drake played with her, read to her, and was affectionate with her. The caseworker also stated, *Page 11 
however, that Mrs. Drake never inquired about the child's then current requirements, including counseling, psychiatric care, or special discipline. She never requested separate visits or for visits in her home. She never requested referrals for parenting or special training to deal with the special needs of S.S.
 {¶ 25} A home study was requested to be done of Mrs. Drake's home. Daniel Gear, the kinship placement coordinator, conducted the home study and reported to the court. The mother has objected to a part of Mr. Gear's testimony and has also claimed an abuse of discretion in the failure of the trial court to place S.S. in the legal custody of Mrs. Drake. The testimony to which the mother objected was Mrs. Drake's personal history with the children services agency from 20 years earlier while she was raising her own children. According to Mr. Gear, Mrs. Drake had a son removed from her home for two years due to physical abuse by her then husband.
 {¶ 26} Mr. Gear also testified that Mrs. Drake's then 13-year-old daughter, the mother of S.S., was also removed from her home and that there had been more than 30 referrals lodged against the family between 1981 and 1998. Upon further questioning, including quite a few questions by the trial judge, it was established that Mrs. Drake's daughter was returned to her home the next day and that the only matter that resulted in any court action was the removal of her son. Thus, these latter two matters were not significant. *Page 12 
 {¶ 27} The trial court overruled objections to the testimony regarding the removal of Mrs. Drake's son and permitted the evidence pursuant to the business records exception. The mother has renewed her argument on appeal and claims the evidence is inadmissible hearsay and irrelevant.
 {¶ 28} Based on a careful review of the transcript and the trial court's judgment entry, this Court concludes the trial court did not rely on this testimony in reaching its conclusion. In his decision, the trial judge concluded that Mrs. Drake was neither an appropriate nor a suitable person to have legal custody of S.S. In the course of his explanation for this conclusion, the trial judge briefly noted that Mrs. Drake's son had been removed from her care, but the focus of the court's concern was decidedly the situation at the time of the hearing. The trial judge expressed concern with the manner in which Mrs. Drake still viewed the removal of her son; the manner in which she addressed her own daughter's immediate difficulties with the children services agency; and her failure to demonstrate an understanding of S.S.'s then current behavioral problems, including how to continue the child's progress and how to protect her from future abuse — particularly in light of the fact that she had already been abused twice while in her mother's custody.
 {¶ 29} As to these matters, the trial judge pointed out that Mrs. Drake continued to deny any basis for the removal of her son and demonstrated no understanding of her role in securing his return. She maintained that her son was *Page 13 
not physically abused by her husband, but rather hurt himself crawling out of a doghouse. She also professed a total lack of understanding as to why it took two years to obtain his return to her home. Next, as to her daughter's difficulties, the trial judge noted that Mrs. Drake claimed to be very close to her daughter, yet did not believe that her daughter had a drug or alcohol problem, and only believed her daughter needed to get a good job and stable housing. She was aware that the child's mother had not completed her parenting classes, but dismissed the importance of this requirement, stating she "does what she can do." Mrs. Drake also claimed to have been very close to S.S. before the child was removed from her mother's home, yet was not aware that S.S. had not been attending school and claimed she never saw the child misbehave. She promised that she would provide the child with whatever help she needed, but demonstrated little comprehension of the child's precise needs.
 {¶ 30} Moreover, it was not from a 20-year-old agency document, but from her daughter's own testimony in this case, that the trial court heard that the mother was raped in her own home at the age of 16 and that Mrs. Drake showed little concern for her at the time. In fact, Mrs. Drake testified that she knew nothing about the rape. In addition, according to Dr. Wood, the mother reported that, when she (the mother) was 13, Mrs. Drake married a very young man and began ignoring the mother's needs. The mother reported a generally strained and conflicted relationship with Mrs. Drake after the divorce of her parents. *Page 14 
 {¶ 31} Mrs. Drake indicated that she would follow the court's instructions as to any contact between S.S. and her mother, but failed to demonstrate that she appreciated the seriousness of the risk posed to the child by her mother. Mrs. Drake stated that she understood that S.S. reported that her mother had hit her with a belt, but nevertheless said that she had no concerns regarding S.S.'s safety when she was with her mother.
 {¶ 32} The second best interest factor concerns the child's wishes about where she should live. The trial judge interviewed S.S. in camera early in the proceedings, and, at that point, she expressed a wish to live with her mother and siblings, though both siblings were in the legal custody of relatives and not in their mother's home. If she could not live with her mother, she stated that she wanted to live with her grandmother. The trial judge permitted his interview to be supplemented by evidence of subsequent statements by the child. Foster care case manager Hyter stated that S.S. talked about living with her grandmother, but also talked about being adopted by her foster parents. Caseworker Metzel testified that S.S.'s wishes regarding her placement vacillated between her mother, her grandmother, and her foster mother. The guardian ad litem testified that the child had initially expressed a preference to live with her mother or grandmother, but more recently preferred living with the foster family.
 {¶ 33} In the context of evaluating the child's wishes, the trial court found that S.S. was "not sufficiently mature to acknowledge her mental issues and the *Page 15 
demands which will be made upon her caregiver(s)." On appeal, the mother has argued that this best interest factor does not require the child to understand her own needs. Section 2151.41.4(D)(2), however, does take maturity into account as it provides that the trial court shall consider: "The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." Whether the child could understand her needs was part of the trial court's analysis of her maturity.
 {¶ 34} Third, the custodial history of the child reflects that the child resided with her mother for her first year and one-half, but they both stayed with Mrs. Drake for two months early in that period. Following the physical abuse by Corey Smith in 2001, S.S. was placed with her maternal great-grandmother and was eventually returned to the care of her mother. At the end of 2003, Mrs. Drake voluntarily took care of S.S. and a half-sibling for approximately five months, in order to help the mother. In October 2005, S.S. was back in the custody of the children services agency as a result of this action. S.S. was first placed with the parents of Mr. Smith and then with Mrs. Drake. In January 2006, she was placed with a foster family, where she has remained for nearly two years.
 {¶ 35} Fourth, there was evidence before the trial court that supported its conclusion that S.S.'s need for a legally secure permanent placement could only be met by a grant of permanent custody to the agency. Caseworker Metzel testified the mother had not remedied the original concerns and had no insight about how to *Page 16 
protect her child. She also believed that it was not in the child's best interest to be placed in the legal custody of Mrs. Drake. Mrs. Metzel believes that S.S. needs a great deal of structure and her caregivers must be well aware of her needs and be trained to deal with them. She believes that adoption is in the child's best interest.
 {¶ 36} Dr. Wood, the clinical psychologist, also recommended that S.S. not be returned to her mother unless her mental health issues were ameliorated. Dr. Wood emphasized that the mother's personality disorder did not prevent her from being able to parent: she could be effective as long as she recognized her condition and obtained treatment to modify those traits. Unfortunately, the record reveals that the mother did not even attempt to complete the treatment that was recommended for her.
 {¶ 37} The guardian ad litem also stated her belief that permanent custody was in the best interest of the child. The mother has argued that the trial court may not rely on the opinion of the guardian ad litem, but the argument is without merit. The Ohio Supreme Court has specifically indicated that a trial court is permitted to rely on the guardian ad litem's report and that the guardian ad litem is subject to cross-examination for that reason. See In re Hoffman, 97 Ohio St.3d 92,2002-Ohio-5368, at ¶ 25. In this case, the guardian ad litem filed a written report, was sworn, testified at the hearing, and was subject to cross-examination. The trial judge was entitled to consider her opinion as he made his decision. The guardian ad litem expressed her opinion that the mother was not in a position to provide *Page 17 
suitable care for her child. She had not completed the objectives of her case plan, and her child had severe emotional problems that required special care from her caregiver. The guardian ad litem also believed that Mrs. Drake tended to minimize problems and that the child would, therefore, not receive the care and attention she needed in order to thrive if she were placed in her legal custody.
 CONCLUSION {¶ 38} The record demonstrates that Mrs. Drake had a bond with her grandchild and it appeared that S.S. enjoyed seeing her. But the child's wishes regarding placement vacillated among her mother, her grandmother, and her foster mother. The record does not reveal any overriding preference for any one of them. It is apparent that Mrs. Drake loves her granddaughter, but this decision requires more. As stated by the trial judge: "[This child] needs more than a bedroom and new furniture; parenting demands more than a stable income, or even a sincere love. A suitable custodian must be able to provide for this child's special needs and insure her protection. Mrs. Drake does not demonstrate her ability to do either." The trial court did not abuse its discretion in finding that legal custody was not in the best interest of the child.
 {¶ 39} Furthermore, it is clear to this Court that the trial court did not rely on 20-year-old facts in denying legal custody to Mrs. Drake. There was more than sufficient evidence of presently relevant matters to support the trial court's decision not to place S.S. in the legal custody of Mrs. Drake. Accordingly, there is *Page 18 
no prejudice from allowing the testimony regarding Mrs. Drake's history with the agency.
 {¶ 40} Finally, the decision to grant permanent custody of the child to the Summit County Children Services Board and terminate the parental rights of the child's parents was not against the weight of the evidence. Therefore, the mother's assignments of error are overruled, and the judgment of the Summit County Common Pleas Court, Juvenile Division, terminating parental rights and placing S.S. in the permanent custody of the Summit County Children Services Board is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Juvenile Court, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this *Page 19 
judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellant.
CARR, P. J. BAIRD, J. CONCUR
(Baird, J., retired, of the Ninth District Court of Appeals, sitting by assignment pursuant to § 6(C), Article IV, Constitution.) *Page 1