[Cite as *In re K.M.*, 2014-Ohio-4268.]

STATE OF OHIO       )           IN THE COURT OF APPEALS
                    )ss:         NINTH JUDICIAL DISTRICT
COUNTY OF MEDINA     )

IN RE: K.M.                           C.A. No.      14CA0025-M


                                           APPEAL FROM JUDGMENT
                                           ENTERED IN THE
                                           COURT OF COMMON PLEAS
                                           COUNTY OF MEDINA, OHIO
                                           CASE No.     2012 04 NE 0017

DECISION AND JOURNAL ENTRY

Dated: September 29, 2014

---

WHITMORE, Judge.

{¶1} Appellant, Buster E., appeals from a judgment of the Medina County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his child, K.M., and placed her in the permanent custody of Medina County Job and Family Services ("JFS"). This Court affirms.

I.

{¶2} Buster E. ("Father") is the biological father of K.M., born January 27, 2004. The mother of the child, Jamie K., ("Mother") participated to a limited degree in the trial court proceedings, but she ultimately surrendered her parental rights on the first day of the permanent custody hearing.

{¶3} The parents were not married, but have had a long-term relationship. Both parents have criminal records and histories of drug abuse. At the time this case began, Father was incarcerated (failure to comply with order or signal of a police officer) and Mother was in a

drug treatment program. Because the parents were unavailable to care for K.M., she had been residing with Mother's sister, Nicole Hillenbrandt, since the fall of 2011. By the spring of 2012, Ms. Hillenbrandt was no longer willing to provide for K.M.'s care. Consequently, on April 20, 2012, JFS initiated this case in juvenile court, alleging the neglect and dependency of then eight-year-old K.M. The family includes two additional children whose custody is not at issue in the present case. B.M., born July 6, 1998, was charged with the rape of a five-year-old female cousin and was the subject of separate and contemporaneous juvenile proceedings. Infant A.K. was born in November 2013. That child's status is not reflected in the record.

{¶4} Upon stipulation by the parents, the trial court adjudicated K.M. to be a dependent child. The court granted temporary custody to JFS. Derek Cek was appointed as guardian ad litem for K.M., and, later, was appointed to also serve as her attorney. Father's case plan required him to: (1) apprise the agency of his current contact information, any missed appointments, and any police involvement; (2) sign all releases; (3) complete a drug and alcohol assessment and timely comply with requests for drug tests; (4) complete a psychological evaluation and comply with recommendations; (5) maintain a stable home environment; and (6) provide for his child's basic needs.

{¶5} On August 26, 2013, JFS filed a motion for permanent custody. Father opposed the motion and, alternatively, sought a disposition of legal custody with relatives. Following a hearing, the trial court terminated Father's parental rights and placed K.M. in the permanent custody of JFS. Father appeals and assigns one error for review.

II.

Assignment of Error

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY TERMINATING FATHER'S PARENTAL RIGHTS AND GRANTING

PERMANENT CUSTODY OF THE CHILD TO MEDINA COUNTY JOB & FAMILY SERVICES (MCJFS), INSTEAD OF GRANTING LEGAL CUSTODY OF THE CHILD TO EITHER PATERNAL GRANDMOTHER OR MATERNAL AUNT AND LEAVING INTACT FATHER'S RESIDUAL PARENTAL RIGHTS, PRIVILEGES AND RESPONSIBILITIES.

{¶6}    Father has contended that the judgment granting permanent custody is against the weight of the evidence and that the trial court should have granted legal custody of K.M. to the child's grandmother or aunt instead.

{¶7}    R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody to a public services agency. The statute requires the court to find, by clear and convincing evidence, that: (1) one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) apply, and (2) permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶8}    The trial court found that the first prong of the permanent custody test was satisfied because K.M. had been in the temporary custody of JFS for at least 12 of the prior 22 months. *See* R.C. 2151.414(B)(1)(d). The trial court also entered findings under R.C. 2151.414(E)(1), (4), (14), and (16) in support of its alternative determination that K.M. could not be placed with either parent within a reasonable time or should not be placed with either parent. Father has not contested any of the first prong findings, but has rather challenged only the second prong finding that permanent custody was in the best interest of the child. He has argued that it would have been in the best interest of the child to have been placed in the legal custody of the child's paternal grandmother, Marie Hall, or her maternal aunt, Nicole Hillenbrandt.

{¶9} The appropriateness of a legal custody award to relatives invokes consideration of the same factors as a determination of the best interest of a child for purposes of a permanent custody decision. *See In re S.S.*, 9th Dist. Summit No. 23859, 2007-Ohio-7046, ¶ 13, citing *In re S.N.*, 9th Dist. Summit No. 23571, 2007-Ohio-2196, ¶ 27 and R.C. 2151.414(D). As a result, when asked to conduct a review of such a decision, "this Court typically conducts a single 'best interest' review of the trial court's decision to place the child in the permanent custody of the agency rather than in the legal custody to a relative." *In re I.A.*, 9th Dist. Summit No. 26642, 2013-Ohio-360, ¶ 10. If permanent custody is in the child's best interest, legal custody or placement with relatives necessarily is not. *Id.* Consequently, on review, this Court will consider all relevant factors, including, but not limited to, the factors set forth in R.C. 2151.414(D), in evaluating the best interest decision of the trial court. The factors specifically set forth in R.C. 2151.414(D) include: the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, and the child's need for permanence in his or her life. *In re R.G.*, 9th Dist. Summit Nos. 24834 & 24850, 2009-Ohio-6284, ¶ 11.

**Interactions and interrelationships of the child.**

{¶10} Evidence regarding the relationship between K.M. and Mother was vague, but the record suggests that Mother had significant substance abuse issues and had had little recent contact with K.M.

{¶11} Father presented evidence regarding his relationship with K.M. through his own testimony and that of several relatives: Father's mother, Father's sister, and Mother's two sisters. They all testified that Father and daughter loved each other, that Father was very involved in his daughter's life, and that he had engaged in many activities with her. These witnesses all claimed K.M. had a positive relationship with her extended family as well. For his

part, despite evidence of criminal involvement and substance abuse taking place before and during the trial court proceedings, Father emphasized the fact that he has had no positive drug test results and has been involved in Alcoholics Anonymous ("AA") since his release from jail six weeks earlier.

{¶12} For its part, JFS presented evidence of the recurrent criminal incarcerations and substance abuse problems of the parents; expert testimony regarding the mental health and psychological diagnoses of both K.M. and Father; the multiple traumas, abuse, and devastating events experienced by K.M. while living with her family; and, finally, the therapeutic efforts to help her overcome those difficulties.

{¶13} Notably, the record contains no evidence of K.M.'s school attendance or academic performance before this case began. In addition, when Ms. Hillenbrandt was no longer willing to provide care for K.M., no other relative stepped up to offer her a home, compelling JFS to initiate this action. Finally, K.M's report of traumatic experiences from her past included some of her extended family as well as her immediate family.

{¶14} A full understanding of K.M.'s relationship with her family requires consideration of the mental health of the child and the impact that her family had upon her. When this case began, K.M. was evaluated and thereafter counseled by Dawn Cortez McKee, a child and family therapist at Cornerstone Psychological Services. Initially, K.M. was diagnosed as a severely neglected child and with an adjustment disorder, with rule-outs of posttraumatic stress disorder ("PTSD"), a generalized anxiety disorder, and physical and sexual abuse. At that time, K.M. was very guarded with Ms. McKee, her teachers, and her foster family, disclosing little about her past.

{¶15} K.M. had visits with extended family member at the beginning of the case. One such visit took place at the home of the paternal grandmother, Marie Hall, in September 2012. During this visit, Mother telephoned her sister and she – and perhaps also Father – spoke to K.M. Ms. Hall and other relatives described this as a very happy event enjoyed by K.M., yet afterwards K.M. displayed a severe and negative reaction. She became extremely upset, with crying and expressing fears that past bad experiences would start happening again. The therapist concluded that in-person visits with immediate family would be unmanageable for the child and visits with extended family were also stopped.

{¶16} After six months of therapy, K.M. was able to talk about her past and her experiences from her home life. K.M. reported neglect in her care, concerns about housing and safety, and fear of arrests and incarcerations. She was afraid that the bills would not be paid and she would not have food to eat. She spoke about flashbacks in which she recalled her parents using drugs, including seeing her Mother put a needle in her arm at a motel. K.M. drew pictures demonstrating that she witnessed her parents using drugs. She said there were often strangers in her home, using or obtaining drugs, and sometimes the drugs were in her room. When that occurred, she would hide in a closet. She recalled Mother and her aunt locking her in a closet and leaving her alone in the house while they went out together. She reported her grandmother pounding on the floor and screaming "stupid bitch" to her. She spoke about her brother giving her a bath and holding her head underwater until she vomited; putting her in an attic closet while she screamed; and holding a pillow over her face, causing her to feel suffocated. She also recalled her brother feeding her and taking care of her while her parents were out using or buying drugs.

{¶17} About this time, K.M.'s diagnosis was changed to neglect and PTSD. Therapist McKee believed that K.M.'s parents and brother "triggered" psychological distress in K.M. based upon her memories of these experiences. She explained that such triggers can cause a person with PTSD to relive his or her trauma internally. She recommended that K.M. should not have any personal contact with her family because of the fragile state of K.M.'s mental health and because she still lacked the skills needed to cope with coming into contact with her triggers.

{¶18} K.M. continued to make some progress and, in early 2013, she expressed an interest in seeing Father. Therefore, a visit with Father was arranged for April 2013. Caseworker Randy Fike and Ms. McKee wanted to see K.M.'s response to Father and how Father handled her needs during a visit. Both of these service providers met with Father in preparation for the visit. The caseworker testified that he asked Father not to talk about the court case or the legal proceedings. Father denied that he was told to avoid certain things. The therapist spoke with Father about K.M.'s needs and explained that K.M. saw her parents and brother as triggers to her flashbacks of traumatic experiences. Father did not believe there were any such triggers and instead expressed a hope to reunite K.M., Mother, and K.M.'s brother as soon as possible. The therapist believed that Father did not understand K.M.'s mental health diagnosis, the triggers that caused her to relive psychological injuries, or how to deal appropriately with her condition.

{¶19} Service providers observed the visit through a window. The therapist later testified that K.M.'s reaction to Father at the visit was not happy, but rather very stressful. Her anxiety level was high and her body language was "closed off." Her legs were pulled up and her arms were crossed over her body, reflecting, according to the therapist, an effort to protect

herself. When Father asked her to take a picture with him, she said "no." She eventually complied, but crossed her arms protectively and leaned away from him.

{¶20} During the visit Father began engaging in topics that the therapist and guardian ad litem believed were inappropriate, and some that might cause K.M. to be less open with the therapist and deteriorate their relationship. Father asked K.M. whether she wanted to live with him, said we will be a family all together again, told her that she would most likely live with him, asked how her counseling was going, and speculated that it was hard to tell the therapist things. The visit was, therefore, halted a few minutes early.

{¶21} The therapist also testified regarding her counseling session with K.M. conducted on the day after the visit. At that time, K.M. expressed a fear of retribution from Father, believing he would be angry for what she had said. K.M. emphasized that she did not want to live with Father and had been uncomfortable with him during the visit. The therapist felt that the visit caused K.M. to feel helpless, anxious, and nervous.

{¶22} The impact of the visit lasted at least two months. K.M.'s anxiety level became very high whenever the therapist tried to discuss the visit with her or use it in play therapy. K.M. became much more active, almost driven. She jumped off tables and ran around the room. She was destructive of toys and did not use the coping skills that had been taught in previous therapy sessions. Her therapeutic progress regressed a great deal and her therapy went back to "square one." By June 2013, K.M. was making adequate progress again. She was engaged in school, her activity level settled down, and her crying episodes lessened.

{¶23} At the time of the permanent custody hearing, K.M. was diagnosed with neglect, PTSD, and suspected sexual and physical abuse. Her therapist believed she was making progress, but was behind in social skills. K.M., she explained, was on the cusp of moving

beyond trauma therapy, but should continue with counseling. K.M. had expressed that she just wants to be a "normal kid" with a normal family who fits in with the kids at school and gets good grades. Ms. McKee emphasized that stability and consistency are the keys to K.M.'s ability to succeed in the future and, without those, she will likely regress.

{¶24} K.M. has resided with two foster families during this case and made progress while living with both. She did well in school and made friends while living with the first family, but did not "mesh" with them. She never bonded with the foster mother and had conflicts with the teen-aged daughter in the home. After eighteen months, she was moved to a second foster home. Caseworker Fike testified that K.M. had only been in that home two months, but has transitioned very well, made some friends in her new school, and seemed to like the family.

**Wishes of the child.**

{¶25} K.M.'s wishes were expressed by both the guardian ad litem and herself. The guardian ad litem reported that K.M. was consistent in not wanting to live with Father. In February 2013, she expressed a desire to visit with Father, but soon changed her position back to not wanting to see him. When asked how she would feel about not seeing Father ever again, she said she was fine with that. The trial court also conducted an in camera interview with K.M. During that interview, K.M. confirmed that she did not want to live with either of her parents. The caseworker similarly testified that K.M. recently volunteered to him that she felt uncomfortable around Father during the visit and sought the caseworker's reassurance that she did not have to see him again.

{¶26} Father suggests that K.M. had mixed wishes because, during his April 2013 visit with her, she told Father she wanted to live with him. K.M. later explained that she said that

only because she did not want to hurt Father's feelings. After hearing from K.M. directly on this, the trial court concluded that K.M. did not want to not see Father again or have a relationship with him.

{¶27} Father has also argued that K.M.'s lack of contact with him contributed to her not wanting further contact. K.M.'s therapist was asked about the effect of a lack of contact between Father and K.M. She said that K.M. had not indicated any separation anxiety related to the removal from her parents. Rather, K.M. associated her parents and brother with a great deal of trauma. The therapist opined that the lack of contact with them was not the thing that put K.M. in the condition in which she had found herself, but rather it was the history and presence of Father as a trigger to her symptoms. The trial judge specifically found this testimony to be credible.

**Custodial history.**

{¶28} There is little specific evidence of K.M.'s early custodial history, but there is no evidence that she resided anywhere other than with one or both of her parents for the first seven years of her life. In the summer of 2011, K.M. began staying with Mother's sister, Nicole Hillenbrandt. K.M. remained there for nine months until the spring of 2012, when Ms. Hillenbrandt was no longer willing to provide care for K.M. JFS then initiated the present case, and K.M. was placed in foster care. She resided with one family for eighteen months and moved into a new foster home in November 2013, two months before the permanent custody hearing.

**The child's need for a legally secure permanent placement.**

{¶29} Mother surrendered her parental rights to K.M. The agency sought to reunite K.M. with Father through implementation of his case plan and by addressing the principle concerns of criminal history, drug use, and stability. Early on, Father was compliant with

reporting changes in his contact information and in signing releases. He completed a drug and alcohol assessment, a psychological evaluation, and obtained employment. The agency sought a six-month extension of temporary custody in April 2013. JFS even anticipated returning K.M.'s brother to Father's care if he continued making progress and secured housing.

{¶30} During the period of the extension, however, Father faltered and even regressed. Father relapsed into heroin usage, was incarcerated for another criminal offense (theft by deception), was terminated from his job, and was noncompliant with the recommendations made after his substance abuse and psychological evaluations. In addition, he failed to obtain stable housing despite agency efforts to supply him with a security deposit and two month's advance rent.

{¶31} During this period, Father stayed with relatives or in hotels and motels. By May 2013, it had become increasingly difficult for JFS to reach Father and he was returning fewer phone calls. According to a support officer with Medina County Child Support, Father had a monthly support obligation of $302.50 with an arrearage of $6139.36. He made payments only from June to September 2013. Father never established a stable home environment, nor did he demonstrate the ability to provide for K.M.'s needs.

{¶32} Father failed to fully address the substance abuse objective of his case plan. He was diagnosed while incarcerated as opiate dependent, in remission. Father completed eight sessions of a Readiness for Change program, but his outpatient therapist testified that Father was very anxious during class and he constantly required redirecting, often deflecting from topics he should talk about. Given the stress and changes in his life, his therapist was very concerned that he would relapse. She, therefore, recommended a relapse prevention program. She explained that consistency of treatment and regular attendance is important, particularly for people such as

Father who minimize their risks. Father cancelled or no-showed for many of his appointments in the relapse prevention program. He also began to delay reporting for drug tests, making the results inaccurate. The caseworker sought a more revealing hair follicle test, which resulted in Father admitting that he had relapsed into heroin usage from April 2013 and until his incarceration in September 2013. Father was discharged from the relapse prevention program for lack of attendance.

{¶33} Father failed to adequately comply with the recommendations made following his psychological evaluation in which he was diagnosed with an antisocial personality disorder. Father's test scores indicated impulsivity, a lack of remorse for actions, and a failure to take responsibility for one's actions. The assessor's recommendations were to obtain employment, attend Narcotics Anonymous or AA meetings, and engage in mental health and substance dependency counseling. Father did obtain employment immediately after his release from prison in August 2012, but lost his job in July 2013. He was not employed at the time of the permanent custody hearing. He failed to consistently attend mental health or substance abuse counseling. Father testified that he had been attending AA meetings during the six weeks since his release from jail.

{¶34} Caseworker Fike testified that the concerns that brought K.M. into care have not been resolved by the parents and, in particular, by Father. He testified that K.M. needs a permanency plan and needs to know what is going to happen to her. He believed that neither parent was close to being prepared to take care of K.M.

{¶35} K.M.'s therapist stated that trauma to a child is not manageable in the face of a trigger. The therapist concluded, "As long as her parents are associated with that trauma and trigger her anxiety and her distress, I can't see how reunification would be possible."

{¶36} In the alternative, Father has argued that the trial court erred in failing to grant legal custody of K.M. to one of his relatives. Father filed a pre-hearing motion seeking an award of legal custody to any of three relatives: his sister, Marie Robertson; his mother, Marie Hall; or Mother's sister, Nicole Hillenbrandt. *See* R.C. 2151.353(A)(3). By granting permanent custody, the trial court, in effect, denied Father's motion for legal custody. *See In re L.M.*, 10th Dist. Franklin Nos. 10AP-445 & 10AP-447, 2010-Ohio-5447, ¶ 27. On appeal, Father is limited to challenging how the trial court's decision impacted his rights, rather than the rights of third parties. *See In re J.J.*, 9th Dist. Summit No. 21226, 2002-Ohio-7330, ¶ 36. In other words, he is limited to challenging whether the trial court's decision to terminate his parental rights was proper. *Id.* Moreover, R.C. 2151.353 "does not require a juvenile court to consider relative placement before it grants a permanent custody motion. * * * Rather, a juvenile court is vested with discretion to determine what placement option is in the child's best interest." *In re J.C.*, 4th Dist. Adams No. 07CA834, 2007-Ohio-3783, ¶ 30.

{¶37} The caseworker worked throughout the case to secure relatives to serve as legal custodians for K.M. Ms. Robertson took herself out of consideration by failing to complete the home study process and by explaining that she could not provide child care before or after school.

{¶38} Ms. Hall lives in an apartment building limited to residents who are over the age of 55. At the permanent custody hearing, she stated that the unit manager of her apartment building told her that an exception would be made, allowing K.M. to live with her, but she offered no documentary evidence to support that claim. Even if it is true that K.M. could live there, an apartment building for people over the age of 55 might be considered as less than an ideal environment for a young child.

{¶39} Regarding potential placement with Ms. Hillenbrandt, K.M. resided with her at the beginning of this case before she was placed in foster care, but was eventually removed at Ms. Hillenbrandt's request. Ms. Hillenbrandt offered several reasons for that decision. First, Ms. Hillenbrandt no longer wanted to split her time between K.M. and her own teen-aged daughter. Second, she had concerns about summertime child care because her own daughter was usually cared for by her father's family during the summer. Third, she had understood the child-care arrangement to be short-term, with the goal of just getting K.M. through the school year and then her parents were supposed to step up and be involved. Most importantly, she came to believe that the arrangement enabled the parents to not make the changes they needed to make. She felt it was not her responsibility to "fix their mistakes."

{¶40} At the permanent custody hearing, Ms. Hillenbrandt expressed disappointment that she had only been able to see K.M. three times since she was removed. She had expected more contact and did not want K.M. permanently out of her life. She claimed she did a lot of soul searching and her daughter agreed with the plan to seek legal custody. Significantly, she believes the parents have finally conquered their drug abuse problems, a matter on which the evidence is far from clear. The agency expressed concern about returning K.M. to this home due to Ms. Hillenbrandt's request for her removal after the earlier placement and a negative relationship between K.M and her daughter.

{¶41} In sum, Father demonstrated some efforts towards reunification, but his efforts fell short. The case began and ended with him being incarcerated on criminal charges. Despite the resources of counseling and substance abuse treatment, he relapsed into heroin usage in the middle of the case. And despite claims of family support and JFS's offer of financial help, he could not establish a stable home, nor could he maintain existing employment. K.M. suffered

neglect, abuse, and trauma at the hands of those closest to her and she continues to deal with the consequences of that trauma. She now considers either of her foster families, and not her biological relatives, as her family and the place where she finds safety and happiness.

{¶42} The trial court determined that placing K.M. in the permanent custody of JFS was in her best interest. The weight of the evidence clearly and convincingly supports that finding. Thus, the trial court did not err in refusing to grant legal custody to relatives, in terminating Father's parental rights, and in granting permanent custody to JFS. Father's sole assignment of error is overruled.

## III.

{¶43} Father's assignment of error is overruled. The judgment of the Medina County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

HENSAL, P. J.
MOORE, J.
CONCUR.

APPEARANCES:

JOSEPH F. SALZGEBER, Attorney at Law, for Appellant.

JENNIFER A. MOORE, Attorney at Law, for Appellee.

DEREK CEK, Guardian ad litem.