**[Cite as *In re X.F.*, 2025-Ohio-562.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

IN THE MATTER OF: X.F., A.F., N.F.     :
 
    :     C.A. Nos. 2024-CA-21; 2024-CA-22
    :
    :     Trial Court Case Nos. 22230335,
    :     22230336, 22230337
    :
    :     (Appeal from Common Pleas Court-
    :     Juvenile Division)
    :

. . . . . . . . . . .

O P I N I O N

Rendered on February 21, 2025

. . . . . . . . . . .

GARY C. SCHAENGOLD, Attorney for Appellant Mother

NATHAN D. BOONE, Attorney for Appellant Father

PAUL M. WATKINS & JILLANN HENSON, Attorneys for Appellee MCDJF

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Appellants Mother and Father appeal separately from judgments of the Miami County Common Pleas Court, Juvenile Division, which granted the motions of the Miami County Department of Job & Family Services – Child Protective Services ("Agency") for

permanent custody of their three minor children. Both parents argue that the trial court's decision granting permanent custody of their children to the Agency was against the manifest weight of the evidence. Father further argues that the trial court's decision was not supported by sufficient evidence. For the following reasons, the judgments of the trial court will be affirmed.

### I. Facts and Procedural History

{¶ 2} Mother and Father are the biological parents of the following three children: X.F. (born in November 2013), A.F. (born in September 2015), and N.F. (born in January 2018). On November 14, 2022, the Agency filed a complaint in the juvenile court alleging that the children were neglected and dependent as defined in R.C. 2151.03 and 2151.04.

{¶ 3} The complaint alleged that on November 11, 2022, a report was made in Miami County, Ohio, that the family was homeless and living between a storage unit and a car with a broken back window. That night, police officers located Mother and the three children, along with Mother's boyfriend, at a storage lot in a vehicle with a broken back window. Mother's boyfriend had methamphetamine on his person and admitted to having used methamphetamine throughout the day. The officers were concerned about the safety of the children due to the outside temperatures. The three children wore ill-fitting clothing that was both inside out and backwards. The children were very dirty, had a strong odor, and were hungry. Father's whereabouts were unknown. Mother refused respite care or an agreement of temporary custody of the children to the Agency. Therefore, the Agency requested an ex parte order for interim custody of the three children, which was granted. The complaint further alleged that the family had a

significant history with children's services agencies.

{¶ 4} A case plan for Mother was filed on December 6, 2022. It provided for Mother to complete a drug and alcohol assessment and follow through with any recommended treatment; complete a mental health assessment and follow through with any recommended treatment; sign releases of information; complete in-person parenting classes approved by the agency; comply with random drug screens; comply with announced and unannounced home visits; obtain and maintain employment for a minimum of six months; and obtain and maintain independent housing large enough for her and the three children.

{¶ 5} Father was located and appointed counsel; Mother also had appointed counsel. A court-appointed special advocate ("CASA") was also appointed to the case for the children.

{¶ 6} On January 4, 2023, the Agency dismissed the allegations of neglect, and the minor children were all adjudicated dependent. In finding the children dependent, Mother and Father stipulated to the facts as alleged in the complaint and admitted that the children were dependent. Mother agreed to a disposition of temporary custody to the Agency; however, Father requested an additional hearing. Interim temporary custody remained with the Agency until a dispositional hearing could be held for Father.

{¶ 7} On January 26, 2023, Father agreed for the Agency to have temporary custody of the three children. A new case plan was approved and filed concerning Mother and Father. Mother's case plan objectives remained the same. Father was to complete a mental health assessment and follow through with any recommended

treatment; complete a drug/alcohol assessment and follow through with any recommended treatment; sign releases of information; comply with random drug screens; comply with announced and unannounced home visits; obtain and maintain employment for a minimum of six months; and obtain and maintain independent housing large enough for him and the three children.

{¶ 8} A semi-annual review hearing was held on March 29, 2023. Mother did not attend. Case plan services were reviewed with Father, and he indicated he intended to file a motion for custody.

{¶ 9} On October 10, 2023, the Agency filed a motion to change disposition from temporary custody to permanent custody. A pretrial hearing was held on October 19, 2023, and a final hearing was scheduled for December 6, 2023. Mother was served by publication with the motion for permanent custody and did not attend the pretrial hearing.

{¶ 10} On November 29, 2023, the CASA filed a report and recommendation with the court reflecting her recommendation for permanent custody of the three children to be awarded to the Agency. That same day, counsel for Mother and Father filed a joint motion to convert the final hearing into a status conference due to their difficulty contacting their respective clients and inadequate time to prepare. The motion was granted, and the final hearing was rescheduled for January 23, 2024. Additionally, Mother's counsel was granted permission to withdraw, and new counsel was appointed.

{¶ 11} On December 4, 2023, the maternal grandparents ("Maternal Grandparents") filed a motion for leave to intervene, which was granted. Maternal Grandparents then filed a motion for legal custody of all three children.

{¶ 12} Because of the involvement of Maternal Grandparents, the CASA filed a supplemental report and recommendation on January 22, 2024, which again recommended that permanent custody of the three children be given to the Agency.

{¶ 13} On January 23, 2024, Father's counsel filed a motion to continue the final hearing based upon counsel's inability to have sufficient contact with Father and prepare for the hearing. Father's motion was granted, and the final hearing was continued to February 9, 2024.

{¶ 14} On February 9, 2024, the parties appeared in court and the hearing was continued again until March 14, 2024. On February 12, 2024, the Agency refiled its motion to change disposition from temporary custody to permanent custody after the children had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. On February 16, 2024, both parents were appointed new counsel due to a conflict.

{¶ 15} The matter came before the court for hearing on March 14 and 15, 2024, on the motions for permanent custody filed by the Agency and the motion for legal custody filed by Maternal Grandparents. The magistrate heard testimony from Mother, Father, Maternal Grandmother, Maternal Aunt, the CASA, the caseworker, and Angie Gehret, the children's therapist.

{¶ 16} Gehret testified about the issues the children faced in therapy, the progress they had made, and their relationships with others in their lives. Gehret recommended that permanent custody of the children be given to the Agency.

{¶ 17} The caseworker testified that she had assisted the parents in preparing and

understanding the case plan objectives. She testified that Mother and Father had both failed their case plan objectives. The caseworker also testified about the children's visitations with Mother and Father and their interactions during visits. Between January 2023 and April 2023, Mother stopped coming to visitations and there was no contact between Mother and the children for a total of 99 consecutive days. Between January 2023 and mid-June 2023, Father stopped coming to visitations and there was no contact between Father and the children for a total of 135 consecutive days. The caseworker also discussed the children's interactions with their parents, their foster families, and amongst the siblings. She recommended that permanent custody of the children be given to the Agency.

{¶ 18} The CASA testified about her observations of the children's interactions with others, their progress over time, and the wishes of the children. According to the CASA, all three of the boys wanted to live in their respective foster homes. N.F. further indicated that he wanted to live in his foster home but that he wanted Mother to live with them too. The CASA recommended that permanent custody of the children be given to the Agency.

{¶ 19} Mother and Father testified about their respective case plans, their interactions with the children, and what they believed was in the best interest of the children. Mother discussed her history of custody with the children and her relationship with Maternal Grandmother. Mother did not want the children to be placed in the custody of Maternal Grandparents, but she preferred that they have custody over granting permanent custody to the Agency. Father did not think it was in the children's best interest to grant permanent custody to the Agency or to give custody to the Maternal

Grandparents. Both parents suggested they should be granted additional time to complete their case plan objectives.

{¶ 20} Maternal Grandmother testified about her relationships with the children and Mother and previously having temporary custody of the children. Maternal Grandmother filed for legal custody because she was worried about the children and did not want them to stay in foster care forever.

{¶ 21} Finally, Maternal Aunt testified about previously having temporary custody of the three boys and her inability to take on custody again due to her health.

{¶ 22} On April 12, 2024, the magistrate found that neither Mother nor Father had met their case plan objectives. The magistrate found that the children had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period, that the parents had abandoned the children, and that it was in the best interest of the children to be placed in the permanent custody of the Agency. The magistrate denied Maternal Grandparents' motion on the bases that Maternal Grandparents had not seen the children for nearly 18 months and that animosity existed between the grandparents and the parents.

{¶ 23} Mother and Father filed objections and supplemental objections to the magistrate's decision. Maternal Grandparents did not file any objections. On August 1, 2024, the trial court overruled the parents' objections and granted permanent custody of the children to the Agency. Mother and Father timely appealed from the trial court's judgment. Maternal Grandparents are not part of this appeal.

{¶ 24} Mother and Father argue that the trial court erred in granting permanent

custody of the children to the Agency. Although Mother does not identify her argument as such, she essentially contends that the trial court's decision regarding the children's best interest was against the manifest weight of the evidence primarily because she had been making progress on her case plan objectives at the time of the final hearing. Father likewise claims that the trial court's decision finding that it was in the best interest of the children to grant permanent custody to the Agency was against the manifest weight of the evidence and, further, that it was not supported by sufficient evidence. Father also focuses on his case plan progress at the time of the final hearing. Both parents argue that the trial court's decision should be reversed so that they can have additional time to complete their case plan objectives. We will address their assignments of error together.

## II. Permanent Custody

{¶ 25} "A public or private child-placement agency may file a motion under R.C. 2151.413(A) to request permanent custody of a child after a court has committed the child to the temporary custody of the agency pursuant to R.C. 2151.353(A)(2)." *In re C.F.*, 2007-Ohio-1104, ¶ 22. R.C. 2151.413(D)(1) provides that "if a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, the agency with custody shall file a motion requesting permanent custody of the child."

{¶ 26} "R.C. 2151.414 sets forth the procedures a juvenile court must follow and the findings it must make before granting a motion filed pursuant to R.C. 2151.413." *In re C.W.*, 2004-Ohio-6411, ¶ 9. "R.C. 2151.414(B)(1) establishes the test for a juvenile court to apply in ruling on a motion by a public children services agency for permanent

custody of a child." *In re Schaefer*, 2006-Ohio-5513, ¶ 31. A trial court may grant permanent custody of a child to the agency if it determines, by clear and convincing evidence, that: (1) it is in the child's best interest to grant permanent custody to the agency; and (2) any one of the five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies. R.C. 2151.414(B)(1). Clear and convincing evidence is defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. The factors listed in R.C. 2151.414(B)(1) include:

> (a) [Neither subsection (b), (c), or (d) below apply] and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . .
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an

abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 27} In this case, the trial court adopted the magistrate's finding that the Agency had sufficiently proven by clear and convincing evidence that both R.C. 2151.414(B)(1)(b) and R.C. 2151.414(B)(1)(d) were met. Neither parent challenges the trial court's finding that the Agency had sufficiently proven by clear and convincing evidence either of these statutory criteria. Accordingly, we will not consider that aspect of the trial court's decision. However, even if R.C. 2151.414(B)(1)(b) or (d) were met, "[t]he agency still must prove by clear and convincing evidence, that it is in the child's best interest to grant permanent custody to the agency." *In re N.M.P.*, 2020-Ohio-1458, ¶ 26, citing R.C. 2151.414(B)(1). It is this aspect of the trial court's decision that the parents dispute. Mother and Father argue that the trial court's decision was against the manifest weight of the evidence because it was not in the best interest of the minor children to grant permanent custody to the Agency. Father further argues that the trial court's decision was not supported by sufficient evidence.

{¶ 28} "[T]he proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.*, 2023-Ohio-4703, ¶ 18. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving

conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21.

{¶ 29} In contrast, a review for the sufficiency of the evidence involves testing the adequacy of the evidence and determining, as a matter of law, whether the evidence is legally sufficient to sustain a judgment. *In re Z.C.* at ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when ' "the evidence is legally sufficient to support the [judgment] as a matter of law." ' " *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, quoting *Thompkins* at 386, quoting *Black's Law Dictionary* (6th Ed. 1990).

{¶ 30} " 'Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a [judgment] is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.' " *In re Adoption of L.B.R.*, 2019-Ohio-3001, ¶ 19 (2d Dist.), quoting *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.). "As a result, 'a determination that a [judgment] is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.' " *Id.*, quoting *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

{¶ 31} "The agency moving for permanent custody must by clear and convincing evidence prove that the grant of permanent custody is in the best interest of the child." *In re B.C.*, 2014-Ohio-4558, ¶ 26, citing R.C. 2151.414(B)(1). "R.C. 2151.414(D) sets

forth the factors a court must consider in determining the best interests of the child." *In re Schaefer*, 2006-Ohio-5513, at ¶ 49. "Not every statutory condition must be met before a determination regarding best interest may be made." *In re R.L.*, 2012-Ohio-6049, ¶ 18 (2d Dist.). Additionally, "[n]o one element is given greater weight or heightened significance." *In re C.F.*, 2007-Ohio-1104, ¶ 57, citing *In re Schaefer* at ¶ 56. R.C. 2151.414(D) provides that in determining the best interest of a child, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 32} "The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent's having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; a parent's withholding medical treatment or food from the child;

a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated." *In re A.M.*, 2020-Ohio-5102, ¶ 19. Relevant here, R.C. 2151.414(E)(10) includes a consideration of whether the parent has abandoned the child. Pursuant to R.C. 2151.011(C), "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."

{¶ 33} The trial court considered all of these factors in detail and concluded that awarding permanent custody of all three children to the Agency was in the children's best interest. We agree.

### a. R.C. 2151.414(D)(1)(a) (Children's Interactions with Others)

{¶ 34} Angie Gehret testified that all three boys had been diagnosed with post-traumatic stress disorder and struggled with adjustment issues. They were reluctant to deal with the abuse and neglect they had experienced growing up. According to Gehret, X.F. was the most guarded and protective of the three. A.F. and N.F. disclosed some of the scary things they had observed, such as domestic violence between Mother and her boyfriend and sexual abuse. A.F. disclosed that X.F. had been sexually abused as well, although X.F. never made any disclosures to Gehret. However, X.F. did disclose sexual abuse involving Father to Maternal Grandmother in May 2019. For all three children, their social skills were about a year behind in their development, which made it difficult

for them in school and to interact with peers. A.F. was on an Individualized Education Plan ("IEP") and had been in specialized behavioral classes.

{¶ 35} The record shows that although the three children loved their mother, the most significant relationship in each of the children's lives was with their respective foster families. There was evidence that the two older boys cared about Father, but the bond there was not as strong as it was with Mother. Gehret testified that it would negatively impact the children and be a significant loss to them if they were removed from their respective foster homes. The CASA also testified that the children were fully bonded with their foster home placements and had significant relationships with their foster families. Notably, N.F. was closest to his foster mother, to whom he referred as "mom," A.F. was closest to his foster father, to whom he referred as "dad," and X.F. was close to both his foster parents. Both N.F. and A.F. were bonded with their foster siblings and shared that they loved their foster parents very much. X.F. was in a foster home that did not have any other children, which was beneficial for him. The children looked to their foster families to meet their needs and felt safe with their respective families. The foster parents advocated for them in both educational settings and in therapy and ensured that the children attended therapy regularly. A.F.'s foster father advocated for A.F. to be integrated into regular classes. By the time of the final hearing, A.F. had been integrated into four regular classes and was expected to be fully off of an IEP by the third grade. All of the foster homes were potential adoptive homes.

{¶ 36} The boys' relationships with each other were also significant as they had a bond and attachment to each other. Nevertheless, it was determined that the boys

should be separated due to inappropriate touching that occurred shortly after coming into foster care, the parenting of the siblings by X.F., and their aggressiveness when together. The caseworker testified that when the boys were together for long periods of time, A.F. and X.F. would become very aggressive, more so than normal siblings would. N.F., on the other hand, would shut down and remove himself from the situation. Gehret explained that their poor behaviors escalated when they were around each other. The caseworker described that the end of a sibling visit was never like the beginning of the visit, when they would play nicely and get along. Notwithstanding their issues, the foster parents often set up visits between the siblings outside of the visits with their parents to maintain their bond. Although it was not required of the foster parents, they took it upon themselves to have the boys stay in contact. Despite the children's therapist's recommendations, Mother was opposed to keeping the boys separate because they were bonded and grew up together.

{¶ 37} All three of the children worried about their mother, such as whether she had enough food to eat, where she was going to live, or if she would be cold from the weather. X.F. shared that he had had to take care of the younger boys and his mother in the past. When Mother showed up for visits, she was sometimes under the influence of drugs and would not interact with the children. She often did not supervise the children properly and sometimes had a hard time parenting them. When Mother was not under the influence, she would act appropriately and play with the children. When Mother failed to show up for visitations, the children were very worried about her. They were emotionally distraught, displayed troubling behaviors, and were scared of the unknown.

Mother attended approximately 50 percent of her scheduled visits overall and failed to visit at all between January 2023 and April 2023. The children all expressed fear about Mother's boyfriend and, when they learned he was in jail, the children were not as worried about Mother's well-being.

{¶ 38} When Father visited the children, he sometimes appeared to be under the influence and did not interact a lot with them. At other times, Father was very interactive with the children and would play with them and talk to them. A.F. shared that he only felt safe seeing Father during visits at the Agency. Father failed to attend any visits between January 2023 and mid-June 2023. When Father failed to show up for visits, it did not affect the children the same way as Mother's missed visits. The children did not have the same kind of bond with Father as they did with Mother, but it was opined that if the two older boys' relationship was permanently severed, they would miss him. The same could not be said for N.F., whose visits with Father had been suspended early in the case. In addition to N.F.'s disclosure that Father had been one of the individuals who had sexually abused him, when he did have visits with Father, he reacted very negatively to the point that visits were again suspended.

{¶ 39} The children did not have positive things to say about Maternal Grandparents and they never requested to have a visitation with them. X.F. stated that Maternal Grandparents were very mean, and he did not like living with them previously. A.F. disclosed that he did not like them, they were mean to him and Mother, he did not wish to see them, and he did not want to visit with them. Mother testified she was concerned about how Maternal Grandmother treated the children, particularly X.F.

Father testified that he had had several conversations with the children about how mean the maternal grandparents were to the kids and that Maternal Grandparents had mentally abused X.F.

{¶ 40} Gehret opined that, although it would be a big loss for the children to permanently sever their relationship with Mother, the benefit of achieving stability and permanency by granting permanent custody of the children to the Agency outweighed the negative impact that would occur by severing the children's relationship with their parents. The CASA likewise testified that although it would be difficult on the children to cut out a parent permanently, she believed the mental and emotional health of the children outweighed their being with the parents.

### b. R.C. 2151.414(D)(1)(b) (Wishes of the Children)

{¶ 41} Both X.F. and A.F. expressed a desire to continue living with their foster families. N.F. expressed a desire to continue living with his foster family, but he also wanted Mother to come live with them.

### c. R.C. 2151.414(D)(1)(c) (Custodial History)

{¶ 42} The parents had a lengthy history of children services involvement spanning approximately 10 years and multiple counties. In mid-2018, Maternal Grandparents obtained temporary custody of the three children due to Mother's and Father's involvement with Clark County child protective services. In May 2019, due to X.F.'s disclosure of sexual abuse by Father, the children were moved to the temporary custody of Maternal Aunt. After Mother successfully completed her case plan requirements for Clark County, she was reunified with the three children in the fall of 2019.

{¶ 43} In March 2022, Mother and the three children again moved in with Maternal Grandparents.   On August 13, 2022, due to a domestic violence incident involving Mother and Maternal Grandmother, Mother and the three children moved out of the home to a shelter.   Between August 2022 and November 2022, Mother and the children were living in and out of hotels with Mother's boyfriend.

{¶ 44} On November 11, 2022, the children were removed from Mother's custody following a report that the children were living in a car and a storage unit.   Police located Mother and the children inside a vehicle at a storage unit along with Mother's boyfriend who had possession of methamphetamines and admitted to using drugs throughout the day.   The Agency was granted ex parte interim custody of the children on November 11, 2022.   The children were adjudicated dependent, and temporary custody of the children was granted to the Agency on January 4, 2023.   The children remained in foster care after being removed from Mother's custody on November 11, 2022.   Prior to November 11, 2022, Father had not had any contact with the minor children for 10 months, and he did not seek custody of them.   At the time of the final hearing, the children had been in foster care for 16 months and in the temporary custody of the Agency for more than 12 months of a consecutive 22-month period.

### d. R.C. 2151.414(D)(1)(d) (Children's Need for Legally Secure Permanent Placement)

{¶ 45} Gehret testified that the children needed permanency in their lives, and the lack of stability or permanency was a hinderance to their treatment progress.   Gehret explained that the uncertainty of their future was very hard for the children and that,

whatever the plan was for them, they needed permanency in their lives. Gehret opined that the benefit of achieving stability and permanency by granting permanent custody to the Agency outweighed the negative impact that would occur by severing the children's relationship with their parents. Gehret did not believe that permanency and stability could be achieved with either parent if they had not completed their case plan objectives.

{¶ 46} The caseworker believed the children were in need of a permanent placement because they had not had a lot of stability in their lives, which had caused them a lot of emotional issues and trauma. She testified that the boys needed a place where they would be safe and have their needs met. All of their needs were being met in their respective foster placements. The caseworker did not believe that either parent would be able to provide permanency and security for the children, either at the time of the hearing or in the foreseeable future.

{¶ 47} The CASA likewise testified that the children needed stability to feel secure and that they could not start healing until some permanency was achieved. She stated that it would be an injustice to the boys to keep them in limbo solely to give the parents additional time to complete their case plans because the children needed permanency in their lives.

### e. R.C. 2151.414(D)(1)(e) (Applicable Factors in R.C. 2151.414(E)(7) through (11))

{¶ 48} The trial court found that R.C. 2151.414(E)(10) was applicable in this case in that both parents had abandoned the children. For the purposes of Chapter 2151, "a

child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." Between January 2023 and April 2023, Mother failed to have any contact with the children for a total of 99 consecutive days. Mother blamed her lack of visitation on her having an active arrest warrant and not wanting to be arrested in front of the children. However, that would not have prevented her from contacting the children outside of visitation, such as sending a card or calling them. Between January 2023 and mid-June 2023, Father failed to have any contact with the children for a total of 135 consecutive days. Father claimed he missed visitations because he had a suspended driver's license between May and June 2023. This, however, did not explain his lack of visits with the children prior to May 2023 or his failure to have any contact whatsoever with them during the entirety of the 135-day period.

{¶ 49} After a thorough review of all the factors addressed by the trial court, we conclude that clear and convincing evidence supported the trial court's decision that it was in the best interest of the minor children to permanently terminate parental rights and grant permanent custody of the children to the Agency. The trial court's findings were neither against the manifest weight of the evidence nor supported by insufficient evidence.

{¶ 50} On appeal, neither of the parents address the relevant best interest factors. Rather, both parents focus on their relative performance toward the completion of their case plan objectives at the time of the final hearing in arguing that the trial court's decision

was against the manifest weight of the evidence. While a parent's case plan compliance is a relevant consideration in the best interest determination, it is not dispositive. *In re A.K.*, 2017-Ohio-8100, ¶ 11 (2d Dist.), citing *In re T.S.*, 2017-Ohio-482, ¶ 13 (2d Dist.). Even if a parent were to successfully complete all his or her case plan objectives, "[t]he case plan is simply 'a means to a goal, but not the goal itself,' " and other considerations may justify granting a motion for permanent custody to a children-services agency. *In re T.D.*, 2016-Ohio-7245, ¶ 12 (2d Dist.), quoting *In re J.H.*, 2016-Ohio-640, ¶ 47 (12th Dist.).

**{¶ 51}** Regardless, the record shows that the parents were not remotely close to completing their case plan objectives, and they had only begun to make any real progress just before the final hearing in March 2024. The caseworker identified Mother's case plan at trial, which had been put in place on December 6, 2022. Mother was required to: complete a drug and alcohol assessment and follow through with any and all recommendations of service providers; get a mental health assessment and follow through with any and all recommendations of service providers; obtain and maintain employment and housing for at least six months; engage in parenting classes approved by the agency; comply with announced and unannounced home visits; and submit to drug screens. Mother's case plan was reviewed with her in person during the pendency of the case. Although Mother did not agree to having a case plan and refused to sign it, she appeared to understand what it required of her.

**{¶ 52}** Mother was expected to obtain and maintain housing suitable for herself and the children for at least six months. Mother never provided a specific address at which she was staying at any time during the pendency of the case. At the final hearing,

Mother claimed for the first time that she had been living with Father and Paternal Grandmother. There was no evidence submitted at trial as to the conditions, size, or arrangement of Paternal Grandmother's house to support that it would be suitable for the children. The only information known was that Paternal Grandmother owned the home and refused to allow Agency workers inside.

{¶ 53} Mother was expected to obtain and maintain employment for at least six months. Although Mother claimed to be working on occasion, she never provided any proof of employment. At the final hearing, Mother submitted two pay stubs indicating that she got hired on February 11, 2024. Mother testified she made $13 per hour and planned to work about 36 hours per week. However, the store Mother was going to be working at was still being built, so she had been trained at a different store and had not yet worked 36 hours per week. Mother received $26.73 for her first paycheck and $290.95 for her second paycheck. The caseworker testified that Mother had not provided those pay stubs prior to the final hearing, and this case plan objective still was not complete because she was supposed to maintain employment for six months.

{¶ 54} Mother was expected to complete parenting classes approved by the Agency. The Agency made two referrals for her, but Mother did not attend any parenting classes. At the final hearing, Mother testified that she had recently participated in a program called Triple P. The caseworker testified that she was not familiar with that program, and it was not an approved parenting class by the Agency. Mother testified that she had completed five or six modules of the parenting classes and had two or three modules to finish.

{¶ 55} Mother was expected to obtain a mental health assessment and follow through with any and all recommendations from service providers. Mother was also expected to obtain a drug and alcohol assessment and follow through with any and all recommendations from service providers. On February 6, 2024, Mother participated in a dual mental health and drug abuse assessment at TCN Behavioral Health ("TCN") for the first time. She did not participate in any other mental health assessments or treatment during the case. According to Mother, TCN recommended that she participate in a partial hospitalization program that would require her to go to a building five days a week for four hours per day. However, there was not a spot available, so Mother got a recommendation to participate in an intensive out-patient program that required her to attend three days per week. Mother started attending group sessions in February 2024, but then she missed a few times because she was sick. Mother explained that the policy was that if you missed a few sessions, then you had to have an individual meeting before being able to return to group sessions. Mother missed an individual meeting due to her health, but had an individual meeting scheduled for March 20, 2024, the week after the final hearing was held. In total, Mother attended four group sessions with TCN and missed nine group sessions and one individual session. Additionally, Mother admitted that she was a drug addict and that her drug of choice was methamphetamines. Mother claimed at the final hearing that she had been sober for about two months, or since around January 15, 2024. Mother submitted to three drug screens during the course of the case, all of which tested positive for methamphetamines and amphetamines. Mother refused to take approximately 25 screens when asked, and the case plan advised that any refusal

would constitute a positive drug screen. Mother testified that she tested negative for two drug screens while she was at TCN, but there was no evidence submitted in support of her claim. On the day of the final hearing, Mother voluntarily submitted to a drug test, which was negative.

{¶ 56} Mother was supposed to sign releases for the Agency. In the very beginning, Mother signed a release for a mental health agency, but it was unable to find any records that she had had an assessment.

{¶ 57} The Agency was unaware of Mother's address at any time during the case, so it was unable to conduct any home visits. The caseworker attempted to locate Mother by checking hotels in areas she was known to frequent, including hotels in Springfield, Xenia, and Huber Heights, but was not successful in finding her. Mother testified at the final hearing that she was living with Father and Paternal Grandmother. Due to Mother's refusal to disclose her whereabouts, no home visits were conducted.

{¶ 58} Due to Mother's failure to comply with the case plan objectives, the caseworker deemed Mother's progress a failure. At the time of the hearing, the Agency had ongoing concerns about substance abuse, lack of housing, lack of employment, and the failure to address any mental health or substance abuse issues. The caseworker had concerns that Mother would not be able to provide adequate care for the children and that they would be at risk of harm if they were placed back in her care. According to the caseworker, Mother's lack of cooperation with the case plan services indicated a lack of commitment to the children. The caseworker had offered to help Mother several times and take her to a shelter or provide referrals for mental health counseling. Mother did

not want any help and stated that she would take care of things on her own. Before the Agency filed for permanent custody, the caseworker had warned Mother that if she did not complete her case plan services or make any effort, that the Agency would file for permanent custody. Mother still did not make any effort to complete the case plan requirements until just before the final hearing.

{¶ 59} Although Mother testified that if she were given more time, she would complete all the case plan objectives, Mother's history did not reflect that she would be successful. Mother had ample opportunity to complete her case plan objectives and failed to do so. Based on this record, the trial court did not err in finding that the best interest of the children was to grant the Agency permanent custody.

{¶ 60} Father's case plan objectives were: participate in a mental health and drug/alcohol assessment and follow through with any and all recommendations from service providers; sign releases of information; obtain and maintain housing adequate for himself and the three children; obtain and maintain employment or proof of income for at least six months; participate in random drug screens; and participate in announced and unannounced home visits. The caseworker reviewed the case plan with Father in person and he appeared to understand what was required of him. Father signed the case plan on January 26, 2023. Father testified that when he signed the case plan, he did not realize he was agreeing to do all the case plan objectives because he had not been involved in the situation that resulted in the children's removal from Mother. Once he learned he was supposed to complete the case plan, he refused to do it because he felt like he did not do anything wrong. The record reflects that Father did not complete his

case plan objectives.

{¶ 61} Father testified that in January 2023, he went to TCN and had a dual mental health and drug/alcohol assessment.   According to him, they made no recommendations for him because he was already in AA as a recovering alcoholic.   When he tried to get the paperwork for it, they did not have a record of his assessment.   He was scheduled to get a new assessment on Monday, March 18, 2024, the week after the final hearing.

{¶ 62} Father was expected to sign releases of information.   About two to three months prior to the final hearing, Father signed a release for TCN because he stated he had done a dual mental health and drug/alcohol assessment recently.   TCN reported that Father had not been a patient with them since 2019.

{¶ 63} Father was expected to obtain and maintain housing that was adequate for himself and the children for at least six months.   During the pendency of the case, Father stated that he resided with his mother who was not willing or able to provide care for the children.   Paternal Grandmother was willing to take the three children in but did not want any involvement with the Agency and would not allow any children's services employees into her home.   Father testified that, despite his medical disabilities, he spent all his money remodeling Paternal Grandmother's home so that the boys could live with him. He did not submit any evidence of the conditions of the home to establish that it was suitable for the children.   When the caseworker asked to do a home visit with Father, he refused.

{¶ 64} Father was expected to obtain and maintain employment or proof of income for at least six months.   At the beginning of the case, Father stated he was doing odd

jobs, like renovations, but he did not provide any proof that he was paid for them. Father was not employed at the time of the final hearing, but he had been working on getting disability benefits for over a year. Father claimed that the doctor who checked him out and a forensic psychiatrist both recommended full disability. Nevertheless, on February 15, 2024, Father was denied disability benefits. Father testified that his lawyers were going to appeal the denial for him.

{¶ 65} Father was expected to comply with any and all random drug screens. Father complied with one drug screen in January 2023 and tested positive for methamphetamines. Although he tested positive for methamphetamines, Father denied having anything to do with drugs and he claimed the test was not done correctly. Father admitted he was a recovering alcoholic and stated he was sober and going to AA meetings. Following the positive drug test, Father refused every screen that was offered to him and refused a screen that was ordered by the trial court. Father was offered approximately 15-20 drug screens that he refused. Father was aware that a refusal was deemed positive for all substances. Father testified at the final hearing that he was willing to take drug screens going forward if requested of him, so long as they were done right and he was treated fairly. On the day of the final hearing, Father voluntarily submitted to a drug test that tested positive for methamphetamine.

{¶ 66} The caseworker's concerns for Father at the time of the hearing included his substance abuse, mental health, lack of housing, lack of employment, and lack of cooperation with the Agency. Father showed a lack of commitment to the children and a lack of accountability. Father stated that he did nothing wrong and was not at fault for

anything that had happened so he should not have had to comply with the case plan. Father still complains on appeal about being required to work on a case plan in the first place and places blame on everyone but himself for his failure to comply.

{¶ 67} Like Mother, Father testified that he was willing to comply with all the case plan requirements if granted additional time. However, Father likewise had an ample opportunity to comply with the case plan requirements or to make significant strides in completing the case plan objectives prior to the final hearing. "[A parent] is afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal." *In re L.M.*, 2011-Ohio-1585, ¶ 50 (11th Dist.).

{¶ 68} The record establishes that the trial court considered all the factors under R.C. 2151.414(D)(1) and determined that it was in the children's best interest to grant the Agency permanent custody. We conclude that there was clear and convincing evidence in the record to support that finding, and the trial court's decision was not against the manifest weight of the evidence. Furthermore, we conclude that the trial court's decision to permanently terminate Mother and Father's parental rights and grant permanent custody of the children to the Agency was based on sufficient evidence. Mother's and Father's assignments of error are overruled.

### III. Conclusion

{¶ 69} Having overruled all the assignments of error, the judgments of the trial court will be affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.