[Cite as *In re C.P.*, 2026-Ohio-1477.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | |
|---|---|
| IN RE: C.P., M.R., C.R. | :<br><br>:   C.A. No. 30705<br>:<br>:<br>:   Trial Court Case Nos. G-2023-001635-<br>:   0H; G-2023-001636-0I; G-2023-<br>:   001634-0G<br>:<br>:   (Appeal from Common Pleas Court-<br>:   Juvenile Division)<br>:<br>:   **FINAL JUDGMENT ENTRY &**<br>    **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on April 24, 2026, the judgments of the

trial court are affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately

serve notice of this judgment upon all parties and make a note in the docket of the service.

Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified

copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note

the service on the appellate docket.


For the court,


_____
RONALD C. LEWIS, PRESIDING JUDGE

TUCKER, J., and HANSEMAN, J., concur.

**OPINION**

GARY C. SCHAENGOLD, Attorney for Appellant
MICHAEL P. ALLEN, Attorney for Appellee

LEWIS, P.J.

{¶ 1} K.H. ("Mother") appeals from judgments of the Juvenile Division of the Montgomery County Common Pleas Court that granted permanent custody of three of her children to the Montgomery County Department of Jobs and Family Services – Children Services Division ("MCCS"). For the following reasons, we affirm the judgments of the trial court.

## I. Facts and Course of Proceedings

{¶ 2} On April 3, 2023, MCCS filed a complaint alleging that three of Mother's children, C.P., M.R., and C.R., were neglected and dependent. The complaint raised concerns about the condition of Mother's home and the fact the children were left unsupervised. According to the complaint, (1) on April 1, 2023, MCCS received concerns that Mother's children were running in a street wearing only diapers; (2) Mother's paramour lived in the home and was arrested due to an outstanding felony warrant; (3) MCCS observed toys, trash, water, and food all over the floor; and (4) the children were extremely dirty.

{¶ 3} On July 5, 2023, the three children were adjudicated neglected and dependent, and MCCS was granted temporary custody of the children. On September 17, 2024, following the grant of a first extension of temporary custody, MCCS filed a motion for permanent custody of C.P., M.R., and C.R. On March 10, 2025, Mother filed a motion for legal custody.

### a. March 12, 2025 Hearing

**{¶ 4}** On March 12, 2025, the magistrate held a permanent custody hearing involving C.P. and C.R. D.M. testified that she had been the foster mother of C.P. and C.R. since February 2024. At the time of the hearing, C.P. was seven years old and C.R. was almost four years old. When D.M. first became their foster mother, both children had behavioral issues. C.R. was very active and defiant, but his behavioral problems were improving. D.M. explained that C.R. got "stuck" and was not able to get out of a negative attitude. When he first began living with D.M., C.R. got bruises from intentionally falling to the floor. By the time of the hearing, he no longer did that. C.R. received instruction at school about how to calm his body. D.M. noticed that during visitation with their mother, the children jumped on furniture and were mean to each other. She noted that the behaviors of C.R. and C.P. seemed to worsen immediately before and after visitation with Mother.

**{¶ 5}** Kristin Onkst, who had been the ongoing case manager at MCCS for C.R. and C.P. since May 2023, testified that MCCS received a referral involving Mother on April 1, 2023, upon a report that two of her children, M.R. and C.R., were running down a street in their diapers without any adult supervision. When the police investigated, they found Mother's residence in poor condition. C.P., M.R., and C.R. had been in foster care since they were removed from Mother's care. M.R. was placed with a different foster parent than his siblings to help address his behaviors, while C.P. and C.R. were allowed to stay together.

**{¶ 6}** MCCS created a case plan with a goal to reunite C.P. and C.R. with Mother. The case plan included the following objectives: complete a mental health assessment, take parenting classes, obtain appropriate housing, achieve a stable income, and sign necessary releases. Visitation was also encouraged. Mother completed a dual mental health assessment in April 2024. Onkst had concerns that Mother had not attended

3

counseling regularly since January 2025 and that Mother continued to use marijuana. Mother had a positive test for marijuana in December 2024.

{¶ 7} Mother had independent housing, but Onkst opined that it likely was not big enough to reunify her with C.P., M.R., and C.R. Onkst also did not believe the bunk beds in the house were appropriate for the children. Onkst had concerns that Mother did not have the financial ability to maintain her housing. Mother previously lived in a homeless shelter from April 2024 to July 2024. After she left the homeless shelter, Mother received assistance in paying for her housing, but she became solely responsible for her housing payments in January 2025. Mother was employed at Rally's and earned about $1,200 per month after taxes. At the time of the March 12, 2025 hearing, Mother's rent was $894 per month. Onkst noted that Mother's phone number often changed and that her phone had been shut off sometimes for nonpayment.

{¶ 8} Mother completed a parenting class but struggled to follow through and maintain structure during her visits with her children. Onkst noted that some visits were good while others were chaotic. Onkst testified that Mother got overwhelmed during visitation with her children. She described visitation as follows:

[Mother] starts off good. And she's brought in toys. She's -- her most current thing that is actually a hit is Play-Doh. But she would just bring in toys for the kids to play with. There was no structure to the visits, so they would then start to get very animated, and they'd be loud. [C.R.]'s a screamer and screams inside. There is no inside voices and outside voices when it comes to [C.R.].

[M.R.] is kind of the same way. I've witnessed [M.R.] jumping from chair, climbing on top of the -- the bookcase, getting in the bookcase, climbing on the backsides of the -- the couch and holding on to the wall like where the

4

window is and kind of -- I don't know what -- how you want to call that. I kind of want to call it monkeying across just because that's all he is, just climbing all over everything. Then he'd jump over to the other loveseat. They'd fight between themselves.

I've seen a time where [Mother] would be addressing something with [C.P.] and being upset with and talking to him. She would have them in time out almost in separate places. And while she's dealing with one -- [C.R.] was the one that jumped across the -- the couch and jumped onto the loveseat where [M.R.] was sitting and put [M.R.] in a headlock. Then they both ended up on the floor, and they were kind of screwing around, playing with something or wrestling. It was hard to tell based on my perch watching the monitor of exactly what. And then eventually [Mother] would try to address that, and then [C.P.] would go off, do something.

March 12, 2025 Tr. 54-55. Onkst stated that it was very difficult for Mother to manage the behaviors of the three children during visitations. According to Onkst, Mother "[didn't] always address the behaviors when [they were] happening, or she [waited] until [it had] gotten way out of control before she trie[d] to address it and then the kids just [didn't] listen." *Id*. at 55.

{¶ 9} Onkst testified that she witnessed Mother get overwhelmed several different times during visitation. Onkst stated, "When that happens, [Mother] kind of shuts down where she will just sit on the couch. The kids will be doing whatever the heck they're doing. And she's just -- I don't know if she's zoning out. She's trying to catch her breath. You know, I try to give her the benefit of the doubt, but it is very hard to -- to witness that kind of thing." *Id.* Onkst explained that visitation was especially difficult during the winter months

5

when Mother could not take the children outside during visitation. Onkst agreed on cross-examination, however, that any parent would struggle to demonstrate proper parenting skills in dealing with the behaviors of C.P., M.R., and C.R. She noted that Mother had improved over time with structuring her visits with her children, but she still did not maintain the structure for the entire visit.

{¶ 10} From December 2023 until June 2024, Mother only visited her children once. Mother told Onkst that she had transportation issues and medical issues during this time. At the time of the hearing, Mother did not have her own mode of transportation. While Mother had only shown up for visits 54% of the time since the children were removed, she had been more consistent in her visitation after June 2024.

{¶ 11} When asked what MCCS's ongoing concerns with Mother were, Onkst testified:

Her stability and her ability to maintain and even react to any additional situations. And what I mean by that is she's maintaining an existence right now. She's working her butt off, and I will give her credit for that. But it's not enough to maintain, which is just getting by. She's -- but if anything is to happen, if she -- if the kids went home, if she gets a call because of behaviors, you know, there's issues where they've been kicked out of daycare or behaviors at school. If she has to leave work, that's going to affect her income. That's going to affect her job.

She did send me a letter from her employer that they would be willing to work with her for appointments and such, which is fine, but also the letter states that she wants to be able to have a week's notice, you know, of appointments, which I get, but it's the when there is no week notice how that

6

will affect her employment? And because she's on such a tight budget, if that gets affected, then that will affect her ability to keep her home. And then her overall mental health in dealing with the behaviors of the three boys just based on the examples that it doesn't go well even for the two hours.

March 12, 2025 Tr. 59-60.

{¶ 12} Onkst noted that Mother had not completed her AOD program or adequately addressed the reason for her marijuana use. Onkst also had concerns that Mother continued to have a relationship with her youngest child's father, who was a known methadone user. She explained that it was MCCS's position that reunification with Mother in the foreseeable future was unlikely because Mother was barely able to meet her own needs and it was uncertain whether she could address her children's needs.

{¶ 13} Onkst testified that C.R. and C.P. live with five other children at their foster mother's house. There were five bedrooms there, and the housing was safe and appropriate. C.P. had resided there since February 14, 2024. This was his third foster placement. All his needs were being met. C.P. had a lot of anger issues and had become more aggressive. His behavioral issues were being addressed in therapy. Onkst stated that C.R.'s needs were being met by his foster mother, and his behavioral needs were being addressed in therapy.

{¶ 14} Mother testified last at the March 2025 hearing. At that time, Mother was current on her rent payments. While she conceded that her phone sometimes got shut off, she explained that she quickly got the phone turned back on as soon as she received her next paycheck. She had worked about 35 hours per week at Rally's since September 2024.

{¶ 15} Mother stated that she attended mental health counseling remotely approximately every other week. When Mother had additional stress going on in her life,

7

she participated in the telehealth sessions on a weekly basis.   She testified that she used THC by choice but was not addicted to it.   Mother also addressed Onkst's concerns with her continued relationship with the father of her youngest child.   According to Mother, she was not currently in a relationship with him and did not do any drugs with him.

**{¶ 16}** Mother stated that C.P. was very well behaved with her.   He was very helpful and wanted to come live with her.   Mother testified that Onkst had told her that the children may be acting out during visitation because they craved Mother's attention.   Mother disagreed with the characterization of her "zoning" out during visits.   Mother explained:

> I feel that any parent, when things are getting too hard, any parent has to step away, back off for a moment and breathe because it's just so much going on at one time.   So I can't do a lot.   I know I'm obviously under camera. I don't want to do anything wrong.   I don't want to hurt my kids' feelings, and I don't want to take their behaviors personal because I understand that they're children.   They're traumatized.   They're upset.   They don't understand what's going on.
>
> So I back off to regroup myself, and I tell myself, it's not you that they're doing this for.   It's not your fault.   Just breathe, give them a moment, and everything will be okay.   Because I don't feel like they do it to be mean.   I just feel like there's a lot not being understood going on, so I try not to take those things personal.

March 12, 2025 Tr. 90.   After speaking with Onkst, Mother brought in Play-Doh rather than toys, which helped to prevent overstimulation and allowed the kids to make something with their hands.

**{¶ 17}** Mother believed that reunifying her with the three children was in her children's best interest. She noted that the children had been through multiple foster homes and would be better off reuniting with her. Mother stated that she was able to support them and meet all their needs.

### b. May 28, 2025 Hearing

**{¶ 18}** On May 28, 2025, the magistrate held a permanent custody hearing and heard testimony focused on M.R. S.F., who had been M.R.'s foster mother for two years and two months immediately preceding the hearing, testified that M.R. had bonded with her and the other children in her home. S.F. wanted to adopt M.R., and if she did, she would allow Mother to have a relationship with M.R. because Mother had "a great bond" with him.

**{¶ 19}** M.R. had behavioral concerns when he first began living with S.F. According to S.F., M.R. "would have meltdowns, screaming, hollering, throwing objects. In public, he'll run away from you if you don't -- having -- holding his hand at all times." May 28, 2025 Tr. 6. M.R. was kicked out of a head start program due to his behavior. S.F. described M.R.'s typical behavior at the time of the hearing as follows: "[W]hen he first gets up in the morning, he's the real sweetest person there is, but as the day go on, if things are not going his way, it's meltdown time, and throwing objects. At one time, he was getting better at doing it, but now he's regressing." *Id.* at 7. Previously M.R. saw a therapist once per month, but at the time of the hearing, he was not seeing a therapist. S.F. was waiting to hear back from a facility that was trying to match M.R. up with a new therapist.

**{¶ 20}** Onkst, who had been M.R.'s case manager for two years, also testified at the May 28, 2025 hearing. Onkst set up a case plan with the goal of reuniting M.R. with Mother. Onkst explained that the case plan included the following elements: mental health assessment, parenting, housing, employment, visitation, sign releases, and "maybe a drug

9

screen here or there if I wished." May 28, 2025 Tr. 15. Onkst stated that Mother did not consistently engage in her mental health treatment and missed four of her last six scheduled appointments. Mother took a parenting class but did not demonstrate behaviors learned from that class. According to Onkst, Mother got "easily overwhelmed" during visitations and resorted to screaming at the children. In her most recent visit with the children prior to the May 2025 hearing, Mother strapped the two youngest children into highchairs when she got overwhelmed. Onkst explained that many of the visits were chaotic because Mother did not pay attention to the whole room, and "[i]t . . . [was] just a lot for anyone to handle." *Id.* at 18. Onkst noted that Mother did have some good visits with the children during which she provided structure. Onkst said that "if [Mother had] . . . a plan, they [did] all right." *Id.* at 19.

{¶ 21} At the end of April 2025, Mother moved into a four-bedroom house through the Section 8 housing program. Mother's share of the monthly rent at her new house was $216. Onkst verified that Mother's net income from her employment at Rally's was approximately $600 to $700 every two weeks. Onkst attempted to visit the house before the hearing, but Mother was not home. Onkst still had some concerns about housing based on Mother's history of having deplorable conditions inside her home.

{¶ 22} At the time of the May 2025 hearing, Mother had obtained her own vehicle, but she did not have a driver's license. Onkst testified that the father of Mother's youngest child drove Mother's car, and the children knew him as "Daddy." Onkst was concerned that he was around the children given his history of drug abuse.

{¶ 23} Onkst stated that M.R. has been in the same foster home for two years, his needs were being met, and he was on target for his age. His foster mother wanted to adopt him but was not currently licensed to adopt him. MCCS planned to transfer M.R. to the

adoption unit if it obtained permanent custody. Onkst identified the following reasons why the children could not be reunified with Mother in the foreseeable future: "Because she can't handle the ongoing needs of all of the children, and be able to maintain for herself. She's still trying to show stability. She's making improvements, but kind of run out of time." May 28, 2025 Tr. 34. M.R. could not be placed with his father because his father did not have his own housing, his employment was relatively new, and he had had no contact with M.R. Onkst opined that permanent custody with MCCS was in M.R.'s best interest "[j]ust so that he has a stable place to go. He can get his needs met, and have some consistency continued, and just keep moving forward." *Id.* at 34-35. Onkst also stated that due to the fact M.R. had the most behavioral issues of the three children at issue in the custody proceedings, she did not believe it was likely that Mother could meet his needs even if C.P. and C.R. were placed permanently with MCCS. Onkst noted that M.R.'s foster mother was better able to focus on M.R. and help redirect him when he acted up because his foster mother's other children did not have the behavioral issues that Mother's children had.

{¶ 24} Mother testified last at the May 28, 2025 hearing. She admitted that lately she had not been consistent in her mental health treatment but blamed that on the fact that her counselor had been changed and the treatment provider had not done a good job of contacting her to set up appointments. Mother also conceded that her recent visits with C.P., M.R., and C.R. had been a struggle, but she blamed that on the fact that the weather had been bad, which caused them to be stuck in a small room that contained many things on which to climb. Mother noted that her visits with only M.R. had been good and that he wanted to go home with her. According to Mother, M.R. needed more attention and his brothers stressed him out. Mother noted that M.R.'s behavior had not changed with his

11

foster mother, and he currently was not in counseling. She believed M.R. was better off with her because she had a plan to get him into counseling.

{¶ 25} Mother believed she had appropriate transportation and housing. She did not have her driver's license at the time of the May 2025 hearing but planned to get it within one week of the May hearing. She was able to pay all her bills, and her house had four bedrooms and two bathrooms.

{¶ 26} Mother testified that she remained friends with the father of her youngest child. She stated that he did not get to see C.P., M.R., and C.R. but that she let him speak on the phone with them. Mother explained, "They never seen him because there's no point in him seeing them until he's fully where he needs to be." May 28, 2025 Tr. 64.

### c. Guardian Ad Litem Reports and Recommendations

{¶ 27} In her September 23, 2024 report, the guardian ad litem ("GAL") stated that C.P., M.R., and C.R. needed stability and recommended that MCCS be granted permanent custody of them. The GAL explained her recommendation as follows:

[Mother] has made progress on her case plan, but she has not always visited regularly with her children. She has gone months between visits. Two of her children do not know that she is their mother. Mother has not been able to demonstrate appropriate parenting skills during visits at the agency. There are concerns that she is living with [her youngest child's father] who has a history of substance abuse and is not in treatment. She has not made enough progress to demonstrate stability to reunify with her children.

{¶ 28} The GAL identified the following concerns that led to her recommendation: (1) Mother's children had a history of serious behavioral issues; (2) C.R. and C.P.'s behaviors had noticeably improved under foster care; (3) M.R. was doing well at his foster

12

home and was doing well in preschool; (4) C.P. and C.R. did not seem to know that Mother was their biological mother due to long gaps in Mother's visitations with them; (5) Mother's youngest child, who was born in August 2024, had special needs; and (6) the father of the youngest child, who has a history of substance abuse, was reportedly living with Mother.

{¶ 29} The GAL subsequently authored a May 22, 2025 report in which she repeated her recommendation that MCCS be granted permanent custody of the three children. The GAL explained her recommendation as follows:

> [Mother] has made progress on her case plan. Unfortunately, the boys have significant behavioral issues. The mother has not been able to demonstrate appropriate parenting skills for these special needs boys during visits at the agency. There are concerns that she is living with [her youngest child's father] who has a history of substance abuse and is not in treatment. Even if the father does not reside with the mother, it does not appear that the mother will keep the children from [him].

{¶ 30} The GAL identified the following concerns that led to her recommendation: (1) Mother had not always visited regularly with her children; (2) while visiting with the children, Mother failed to notice C.P. was overwhelmed; (3) during visitation, Mother could not maintain control over the boys for more than 45 minutes; (4) Mother had not been able to demonstrate appropriate parenting skills during recent visits with the three children; and (5) the father of Mother's youngest child had a history of drug abuse and stated that he lived with Mother. The GAL noted that M.R. "has historically said he wanted to live with his mother" and that all three boys seemed to be bonded with Mother.

### d. Magistrate Decisions and Trial Court Judgments

{¶ 31} On June 3, 2025, the magistrate issued a decision granting MCCS's motion

13

for permanent custody with respect to C.P. and C.R. and denying Mother's motion for legal custody. On June 12, 2025, the magistrate issued a decision granting MCCS's motion for permanent custody with respect to M.R. and denying Mother's motion for legal custody. Mother filed objections and supplemental objections to both decisions.

{¶ 32} On November 12, 2025, the trial court issued judgments in which it overruled all of Mother's objections to the magistrate's decisions and granted MCCS's motion for permanent custody. The trial court found that it was in the best interest of C.P., M.R., and C.R. to grant permanent custody to MCCS. Mother timely appealed from the trial court's judgments.

## II. The Trial Court's Judgments Are Not Against the Manifest Weight of the Evidence

{¶ 33} Mother's sole assignment of error states:

THE DECISION OF THE TRIAL COURT TO GRANT PERMANENT CUSTODY [TO] CHILDREN'S SERVICES AND DENY MOTHER'S MOTION FOR LEGAL CUSTODY IS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 34} "[T]he proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.*, 2023-Ohio-4703, ¶ 18. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that

14

the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "'In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.'" *Id.*, quoting *Eastley* at ¶ 21.

{¶ 35} "A public or private child-placement agency may file a motion under R.C. 2151.413(A) to request permanent custody of a child after a court has committed the child to the temporary custody of the agency pursuant to R.C. 2151.353(A)(2)." *In re C.F.*, 2007-Ohio-1104, ¶ 22. "R.C. 2151.414 sets forth the procedures a juvenile court must follow and the findings it must make before granting a motion filed pursuant to R.C. 2151.413." *In re C.W.*, 2004-Ohio-6411, ¶ 9. A trial court may grant permanent custody of a child to the agency if it determines, by clear and convincing evidence, that: (1) it is in the child's best interest to grant permanent custody to the agency; and (2) any one of the five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies. R.C. 2151.414(B)(1).

{¶ 36} Mother does not contest that MCCS satisfied R.C. 2151.414(B)(1)(d) by showing that the children had "been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period." Accordingly, we will not consider that aspect of the trial court's judgments.

{¶ 37} Once R.C. 2151.414(B)(1)(d) is met, "[t]he agency still must prove by clear and convincing evidence, that it is in the child's best interest to grant permanent custody to the agency." *In re N.M.P.*, 2020-Ohio-1458, ¶ 26, citing R.C. 2151.414(B)(1). Clear and convincing evidence is defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required

'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. It is this aspect of the trial court's decision that Mother disputes. Mother argues that the trial court's decision was against the manifest weight of the evidence because it was not in the best interest of C.P., C.R., and M.R. to grant permanent custody to the agency.

{¶ 38} "R.C. 2151.414(D) sets forth the factors a court must consider in determining the best interests of the child." *In re Schaefer*, 2006-Ohio-5513, at ¶ 49. R.C. 2151.414(D)(1) provides that in determining the best interest of a child, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

"Not every statutory condition must be met before a determination regarding best interest may be made." *In re R.L.*, 2012-Ohio-6049, ¶ 18 (2d Dist.). Additionally, "[n]o one element

is given greater weight or heightened significance." *C.F.*, 2007-Ohio-1104, at ¶ 57, citing *Schaefer* at ¶ 56.

{¶ 39} Mother argues that the trial court "failed to conduct a sufficient analysis of the best interest factors." Appellant's Brief, p. 7. According to Mother, "[t]he finding that mother was not able to adequately care for the children was not supported by the evidence." *Id.* Rather, "Mother had stable housing, was employed, was consistently visiting after certain impediments were resolved, got a mental health assessment, got involved in treatment, completed a parenting class, signed releases, and cooperated with the case worker." *Id.* In arguing that the trial court's decision was against the manifest weight of the evidence, Mother focuses predominantly on her progress toward the completion of her case plan objectives at the time of the final hearing. As Mother points out, she had made progress on finding appropriate housing and was working toward obtaining her driver's license so that she could legally drive the automobile she recently purchased. She also had completed a parenting class. But she struggled to apply learned behavior from her parenting class to her visits with M.R., C.P., and C.R. She also struggled to consistently participate in mental health counseling. As a reminder, "[w]hile a parent's case plan compliance is a relevant consideration in the best interest determination, it is not dispositive." *In re X.F.*, 2025-Ohio-562, ¶ 50 (2d Dist.), citing *In re A.K.*, 2017-Ohio-8100, ¶ 11 (2d Dist.).

{¶ 40} The trial court considered all the relevant statutory factors and summarized much of the evidence that was relevant to each statutory factor. The trial court concluded that awarding permanent custody of all three children to MCCS was in the best interests of the children. Based on our review of the record, we conclude that the trial court's judgments are not against the manifest weight of the evidence.

17

{¶ 41} The foster mothers testified that C.P., M.R. and C.R. had improved under their care, and the children's needs were being met. The children were bonded with their foster mothers. The GAL noted that the three children were also bonded with Mother. The trial court took into account that M.R. had expressed a desire to live with Mother. Onkst testified at length about the difficulties Mother had with structuring her two-hour weekly visits with C.P., M.R., and C.R. Mother often appeared overwhelmed and struggled with maintaining awareness of what the other two children were doing when she was interacting with the third child. Onkst highlighted her concern that Mother was not close to being ready to handle custody of C.P., M.R., and C.R. Both the GAL and Onkst also expressed concerns that Mother was exposing the three children to a known drug user, the father of Mother's youngest child. In addition, it is undisputed that Mother abandoned her children by failing to visit or maintain contact with the children for more than 90 days between December 2023 and June 2024. R.C. 2151.414(E)(10). While she had been more consistent in attending the two-hour weekly visitation since June 2024, she still missed sessions. The clear and convincing evidence showed that there was not a viable legally secure permanent placement other than with MCCS.

{¶ 42} The trial court considered all the factors identified in R.C. 2151.414(D)(1). There was clear and convincing evidence presented at the two hearings that supported the trial court's determination that granting permanent custody to MCCS was in the children's best interest. Upon this record, we cannot conclude that the trial court clearly lost its way and created a manifest miscarriage of justice by awarding permanent custody of C.P., M.R., and C.R. to MCCS.

{¶ 43} Finally, Mother argues that we must reverse the trial court's decision because "[t]he Magistrate made no analysis of mother's Motion for Legal Custody, simply denying it

18

in a single sentence."  Appellant's Brief, p. 7.  MCCS responds that no additional analysis on Mother's motion for legal custody was required because the trial court correctly ruled that it was in the best interest of the children to grant permanent custody of them to MCCS. According to MCCS, "'[b]ecause the evidence supports the trial court's best interest finding, it also necessarily supports the court's decision to overrule Appellants' motion for legal custody.'"  Appellee's Brief, p. 10, quoting *In re T.G.*, 2015-Ohio-5330, ¶ 31 (4th Dist.).

**{¶ 44}** The trial court considered the relevant best interest factors when it granted MCCS's motions for permanent custody of C.P., M.R., and C.R.  By granting MCCS's motions for permanent custody, the trial court implicitly overruled Mother's motion for legal custody.   The trial court was not required to make separate best interest findings relating to Mother's motion for legal custody when it had already considered the best interest factors in relation to MCCS's motions for permanent custody.  *In re K.M.*, 2014-Ohio-4268, ¶ 9 (9th Dist.) ("The appropriateness of a legal custody award to relatives invokes consideration of the same factors as a determination of the best interest of a child for purposes of a permanent custody decision.   . . .   If permanent custody is in the child's best interest, legal custody or placement with relatives necessarily is not.").

**{¶ 45}** The assignment of error is overruled.

### III.    Conclusion

**{¶ 46}** Having overruled the assignment of error, we affirm the judgments of the trial court.

. . . . . . . . . . . .

TUCKER, J., and HANSEMAN, J., concur.